UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re: Gemstone Solutions Group, Inc., et al.
                Debtors.

Case No. 19-30258-KLP
Chapter 11
(Jointly administered)

Deutsche Bank Trust Company Americas,
                Plaintiff,

v.

Adv. Pro. No. 19-03071-KLP

Gemstone Solutions Group, Inc., et al.,
                Defendants.

## **MEMORANDUM OPINION**

        The defendants in this adversary proceeding, consisting of certain debtor

entities[1] (the "Debtors") and individuals[2] (collectively, the "Defendants") have

moved to dismiss (the "Motion to Dismiss") each count of the complaint (the

"Complaint") filed by Deutsche Bank Trust Company Americas ("Plaintiff" or

"DBTCA") for the Plaintiff's failure to state a cause of action upon which relief may

---

[1] The named debtor defendants are: Gemstone Solutions Group, Inc. f/k/a Gymboree Group, Inc., Case No. 19-30258-KLP; Gemstone Solutions Card, LLC f/k/a Gym-Card, LLC, Case No. 19-30248-KLP; Gemstone Solutions Mark, Inc. f/k/a Gym-Mark, Inc., Case No. 19-30254-KLP; Gemstone Solutions Manufacturing, Inc. f/k/a Gymboree Manufacturing, Inc., Case No. 19-30256-KLP; Gemstone Solutions RS, LLC f/k/a Gymboree Retail Stores, LLC, Case No. 19-30249-KLP; Gemstone Solutions Operations, Inc. f/k/a Gymboree Operations, Inc., Case No. 19-30255-KLP; and Gemstone Solutions Wholesale, Inc. f/k/a Gymboree Wholesale, Inc., Case No. 19-30253-KLP. (After this adversary proceeding was filed, an order was entered in the Debtors' cases, reflecting the name change of each Debtor. Both the initial and subsequent names are recited herein.). The remaining corporate defendant is Giraffe Intermediate B., Inc. While the cases of these seven entities are all included in jointly administered case No. 19-30258-KLP, they are not the only entities in that jointly administered case. However, for ease of reference, and for the purposes of this adversary proceeding only, the seven debtor defendants together with Giraffe Intermediate B., Inc., will be referred to jointly as the Debtors.

[2] The individual defendants are Steven Coulombe; David Inouye; and Michael Foster.

be granted.[3]  The Defendants have also asked the Court to consider their Motion to Dismiss as a motion for summary judgment.  The Plaintiff opposes the Motion to Dismiss and has moved for partial summary judgment (the "Summary Judgment Motion") as to Count Six of the Complaint.  The Defendants oppose the Summary Judgment Motion and have filed a cross motion for summary judgment (the "Cross Motion") as to Count Six.  These matters are ripe for adjudication.

The Plaintiff seeks the recovery of its share of funds it contends were held in trust by the Debtors for the benefit of Plaintiff and certain other unsecured creditors (the "Funds").  It alleges that approximately five days before the current bankruptcy filing, the Funds were improperly transferred to an account that was subject to a lien in favor of the Debtors' secured creditors.  The Plaintiff asserts claims for breach of trust and conversion against the Debtors and also seeks relief against certain individuals for aiding and abetting the transfer.

The Defendants maintain that the disputed Funds were not held in trust and that in the absence of a trust, each count of the Complaint must be dismissed.  The individual defendants further argue that even if the Complaint states a cause of action, they were released from any claim against them as a result of release and exculpation language in the chapter 11 plan that was confirmed in the Debtors' prior bankruptcy cases (the "Prior Cases").[4]

---

[3] All the Defendants have joined in the Motion to Dismiss except Giraffe Intermediate B, Inc., which is not a debtor in the current jointly administered case.

[4] The Prior Cases were jointly administered as Case No. 17-32986-KLP.  The order confirming the plan may be found at ECF No. 646.

The Summary Judgment Motion is based on the contention that the Defendants should be held in civil contempt for violating the terms of the confirmation order entered in the Prior Cases.  Defendants urge the Court to find that the undisputed material facts support the entry of judgment in their favor as to all counts of the Complaint.

For the reasons stated below, the Court finds that the confirmed chapter 11 plan in the Prior Cases did not require that the Funds be held in trust and further finds that the disbursement of those Funds did not result in a breach of trust.  The Court also finds that the actions alleged in the Complaint do not constitute grounds to find the Defendants in contempt for violation of a court order.  Therefore, cause exists to grant summary judgment in favor of the Defendants as to all counts of the Complaint.

## PRELIMINARY STATEMENT

The Debtors were created pursuant to the September 7, 2017, order (the "Confirmation Order") in the Prior Cases confirming the "Amended Joint Chapter 11 Plan of Reorganization of the Gymboree Corporation and Its Debtor Affiliates" (the "Plan").  The Plan required the Debtors to establish and fund a reserve account in the amount of $4.5 million (the "GUC Distribution") for the benefit of Class 5, the holders of all general unsecured claims, to be distributed upon completion of the claims allowance process (Plan, Art. VII.D).  On September 29, 2017, the Plan became effective and the $4.5 million GUC Distribution was transferred to a reserve account (the "Reserve Account").

DBTCA was the trustee under a November 23, 2010, indenture and held the largest Class 5 claim.  On May 3, 2018, it received $2,510,193.91[5] of the GUC Distribution for the benefit of itself and the holders of the 2018 Notes for which it served as indenture trustee.[6]  On January 9, 2019, the remainder of the Reserve Account was transferred to another account (the "Concentration Account") that the Debtors used for general operations.  One week later, the Debtors filed this case.

DBTCA alleges that the Plan and Confirmation Order established that the Funds in the Reserve Account were held in trust for the benefit of Class 5 creditors. It further asserts that the Defendants misappropriated trust Funds when they caused the Funds in the Reserve Account to be transferred to the Concentration Account, which was subject to a lien held by the Debtors' secured lenders.  DBTCA claims that the transferred Funds were subsequently paid to those secured lenders. Alternatively, DBTCA alleges that even if the Funds in the Reserve Account were not held in trust, the Defendants are liable because they disregarded and violated the Plan and Confirmation Order

In seeking dismissal of the Complaint pursuant to Rule 12(b)(6),[7] the Defendants contend that neither the Plan nor the Confirmation Order created a trust and that without a trust, there can be no claim for breach of trust or conversion and no claim for aiding and abetting a breach of trust or conversion.  The

---

[5] A total of $2,532,283.94 was removed from the Reserve Account and distributed to Class 5 claimholders.

[6] The Gymboree Corporation, a debtor in the Prior Cases, issued 9.125% unsecured senior notes due December 1, 2018, pursuant to 2010 indenture. See Plan Art. 1.A(202-04).

[7] Civil Procedure Rule 12(b)(6), Fed. R. Civ. P. 12(b)(6), is made applicable herein by Bankruptcy Rule 7012(b), Fed. R. Bankr. P. 7012(b).

Defendants also rely on certain release and exculpation provisions contained in the Plan.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia* dated July 10, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is appropriate pursuant to 28 U.S.C. § 1409.

The Court's pretrial order, entered November 20, 2019 (ECF 25), requires any party not consenting to entry of a final order by this Court to file a motion to withdraw the reference within thirty days of the entry of the pretrial order.[8] No party has timely moved to withdraw the reference. Further, in the Motion to Dismiss, the Defendants expressly acknowledged their consent to the entry of final orders or judgment by this Court. ECF 10, pp. 2-3.

## THE MOTION TO DISMISS

<u>Standard of Review</u>. Civil Procedure Rule 12(b)(6)[9] governs motions to dismiss for failure to state a claim upon which relief can be granted. "When considering a motion to dismiss under Rule 12, the Court must assume that the

---

[8] The Pretrial Order provides that:

> Any party not consenting to the entry of a final order by the Bankruptcy Judge shall file a Motion to Withdraw the Reference or for other appropriate relief within **30 days** of the entry of this Scheduling Order, and shall promptly set the matter for hearing. The failure to comply with the terms of this paragraph shall be deemed to constitute consent to the entry of final orders by the Bankruptcy Judge.

ECF 25, p. 4.

[9] Civil Procedure Rule 12(b), Fed. R. Civ. P., made applicable herein by Bankruptcy Rule 7012(b), Fed. R. Bankr. P. 7012(b).

facts alleged are true and take those facts in the light most favorable to the

plaintiff." *Derby v. Portfolio Recovery Assoc., LLC* (*In re Derby*), Adv. Proc. No. 18-

03097-KLP, 2019 WL 1423084, at *1 (Bankr. E.D. Va. Mar. 28, 2019). Although a

complaint's factual allegations are assumed to be true under the 12(b)(6) standard,

a complaint's legal conclusions are not entitled to the presumption of truth:

> "To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, 'to state a claim to relief that is plausible on its face.'
> " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868
> (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955,
> 167 L.Ed.2d 929 (2007)). We accept as true all well-pleaded facts in a complaint
> and construe them in the light most favorable to the plaintiff. *SD3, LLC v.
> Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015). Indeed, a court
> cannot "favor[ ] its perception of the relevant events over the narrative offered
> by the complaint," thereby "recasting 'plausibility' into 'probability.' " *Id.* at
> 430. However, legal conclusions pleaded as factual allegations, "unwarranted
> inferences," "unreasonable conclusions," and "naked assertions devoid of
> further factual enhancement" are not entitled to the presumption of
> truth. *Id.*at 422.

*Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

<u>Factual Allegations and stipulations</u>.[10]  On June 11, 2017, The Gymboree

Corporation and seven of its affiliated companies[11] (the "Reorganized Debtors") filed

the Prior Cases. (Stipulation ¶ 1). On August 30, 2017, the Reorganized Debtors

filed the Plan. (Stipulation ¶ 2). On September 7, 2017, this Court entered the

Confirmation Order. (Stipulation ¶ 3). The Plan required the Reorganized Debtors

---

[10] On May 19, 2020, the parties submitted their joint stipulation of undisputed fact
(the "Stipulations").  ECF 46. The Court has integrated the Stipulations with the
Complaint and eliminated the legal conclusions in the recitation of factual allegations.
[11] The Debtors in the Prior Cases were Gymboree Group, Inc. ("GGI"), Giraffe
Intermediate B, Inc., Gym-Card, LLC, Gym-Mark, Inc., Gymboree Manufacturing,
Inc., Gymboree Retail Stores, LLC., Gymboree Operations, Inc. and Gymboree
Wholesale, Inc.  The prior cases were jointly administered as Case No. 17-32986-KLP.

to fund the sum of $4.5 million into the Reserve Account on the Effective Date.
(Complaint ¶ 28). The Confirmation Order required the Funds to be held in a
segregated account. *Id.* The Plan and Confirmation Order together stated that the
segregated Reserve Account was for the benefit of allowed and disputed Class 5
claims pro rata and to be distributed upon completion of the claim allowance
process to holders of allowed Class 5 claims. (Complaint ¶¶ 29, 30).

On September 29, 2017, the Plan became effective (the "Effective Date")
(Stipulation ¶ 5), and the Reorganized Debtors emerged from chapter 11 as
reorganized entities.  On or about the Effective Date, the $4.5 million GUC
Distribution was transferred to the Reserve Account. (Stipulation ¶ 6).  Defendant
David Inouye, the Manager of Gymboree Group, Inc. ("GGI"), established the
Reserve Account with Bank of America/Merrill Lynch and deposited the GUC
Distribution, in the amount of $4,500,000, into the account. (Complaint ¶¶ 34, 35;
Stipulation ¶ 6).

On or about May 7, 2018, the Reorganized Debtors removed $2,532,283.94
from the account in order to make the first mandatory distribution (the "Initial
Distribution") to creditors then holding allowed Class 5 claims under the Plan.
(Stipulation ¶ 8).  DBTCA, as the former indenture trustee, received $2,510,193.91
of the Initial Distribution.  (Stipulation ¶ 9).  As of May 31, 2018, Funds in the
amount of $2,000,375.79 remained in the Reserve Account, pending completion of
the claim allowance process. (Complaint ¶¶ 37, 38; Stipulation ¶ 10).

On October 1, 2018, the Debtors engaged Berkley Research Group ("BRG") to provide certain financial advisory and consulting services to the Reorganized Debtors. (Complaint ¶ 39; Stipulation ¶ 11).  On December 17, 2018, the Board of Directors of Gymboree Holding Corporation appointed Steven Coulombe, a Managing Director at BRG and the person provided by BRG, to serve as the Chief Restructuring Office ("CRO") of GGI. (Complaint ¶¶ 39, 40).

The CRO was responsible for overseeing the activities of the BRG staff, including Michael Foster, who was engaged to provide professional services to the Reorganized Debtors. The BRG staff, including Foster, provided professional services to the Reorganized Debtors and worked under the CRO's supervision. Foster assisted the CRO in providing professional services to GGI. During the time period in which Foster was providing professional services to GGI, he reported directly to the CRO and worked under the CRO's supervision. (Complaint ¶¶ 41–43; Stipulation ¶¶ 13-15).  On or about January 9, 2019, Foster directed Inouye to transfer the remainder of the GUC Distribution in the Reserve Account (the "Transfer") into GGI's Concentration Account used for general operating purposes. (Complaint ¶¶ 45, 47). Foster directed the Transfer, exercising the authority of the CRO, with the CRO's full knowledge and consent. (Complaint ¶ 46). Following the Transfer, the Reserve Account had a balance of $0. (Complaint ¶ 47).   DBTCA alleges that Inouye, Foster and Coulombe each knew that the Transfer violated the express terms of the Plan and Confirmation Order. (Complaint ¶¶ 68, 69, 70, 86).

On January 16, 2019, GGI, Gymboree Intermediate Corporation, Gymboree Holding Corporation, Gymboree Wholesale, Inc., Gymboree Operations, Inc., Gymboree Distribution, Inc., Gymboree Manufacturing, Inc., Gymboree Retail Stores, LLC, Gym- Card, LLC and Gymboree Island, LLC each filed a voluntary petition for relief under the Bankruptcy Code. (Complaint ¶ 52).

<u>Analysis</u>.  The Complaint alleges that "Article VII.D of the Plan and Confirmation Order created a valid and enforceable trust in favor of the holders of Class 5 Claims ….".  (Complaint ¶62). Because Article I.D of the Plan and Confirmation Order require that construction and implementation of the Plan are governed by the laws of the State of Delaware, allegations that the Plan and Conformation Order created a trust should be interpreted under Delaware law. "Delaware has adopted the rule that a party seeking to prove an express trust must demonstrate an intent to establish such a trust." *Otto v. Gore*, 45 A.3d 120, 130 (Del. 2012).

The intent to create a trust can be demonstrated "by definite, explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty." *Id.*, quoting *Levin v. Smith*, 513 A.2d 1292, 1297 (Del. 1986).

> When determining whether a settlor has formed the requisite *intent* to create a final, enforceable trust, courts look to intrinsic and extrinsic evidence. Intrinsic evidence is defined as "evidence existing within a writing."  In the trust context, this type of evidence refers to the trust instrument itself. Extrinsic evidence is defined as "evidence relating to a contract but not appearing on the face of the contract because it comes from other sources." This type of evidence, for example, would include the circumstances surrounding the creation of the trust and the conduct of the settlors.

*Id.*, 45 A.3d, at 130-31 (footnotes omitted).  DBTCA did not allege the existence of any separate trust instrument, so the Court must analyze whether the intent to create a trust is discernable through interpretation of the Plan and Confirmation Order or by establishing the existence of circumstances where the intention to establish a trust is reasonably certain.  Here, the Complaint fails in both regards.

The Complaint, in its totality, is grounded on the assertion that Article VII.D. of the Plan "expressly obligated the Reorganized Debtors to hold the reserve in a segregated account **in trust** . . . ." (Complaint ¶ 28).  A review of the applicable provision, as quoted in the Complaint itself, reveals otherwise.[12]  The words "in trust" apply only to funds held for the benefit of *disputed* Class 5 claims in order to preserve the *disputed* claimholders' share of funds actually disbursed.  DBTCA does not allege that its claim is disputed or that it is otherwise entitled to funds held for the benefit of holders of disputed claims.

---

[12] Article VII.D provides that:

> On the Effective Date, the Reorganized Debtors shall establish the Class 5 Claims Reserve, which Class 5 Claims Reserve shall be funded with the GUC Distribution and shall be administered by the Reorganized Debtors. As soon as practicable after the Effective Date, the Reorganized Debtors shall make a Pro Rata distribution to all Allowed Class 5 Claims from the Class 5 Claims Reserve using the GUC Amount as the denominator in calculating such Pro Rata Distribution. The Reorganized Debtors shall make one or more additional distributions to Class 5 Allowed Claims, in its discretion, until all Class 5 Claims have been resolved. The Reorganized Debtors shall hold Cash in the Class 5 Claims Reserve in the same Pro Rata share in trust for the benefit of the Holders of Disputed Class 5 Claims. Once all Class 5 Claims have been resolved, the Reorganized Debtors shall make a final distribution in order to distribute the remaining Cash in the Class 5 Claims Reserve Pro Rata to all Class 5 Allowed Claims using the total amount of Class 5 Allowed Claims as the denominator. The Reorganized Debtors shall distribute all such amounts (net of any expenses, including any taxes relating thereto but excluding any legal fees or time of employees of the Reorganized Debtors associated with the reconciliation of such claims.), as provided herein, as such Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable Disputed Claims Reserves.

In contrast to the language protecting holders of disputed claims, the words

"in trust" are not included in Article VII.D or anywhere else in the Plan or

Confirmation Order relative to the establishment of the Class 5 Claims Reserve[13] or

the distribution of funds to undisputed claimholders.[14]  Consequently, ¶ 62 of the

---

[13] The Plan defines the "Class 5 Claims Reserve" in Paragraph 44 of Article I.D's
Definitions as follows:

> "Class 5 Claims Reserve" means a reserve of Cash that will be funded with the GUC
> Distribution into a separate reserve account on the Effective Date pursuant to
> Article VII.D hereof to pay all Allowed Class 5 Claims.

The Class 5 Claims Reserve, by definition, was a reserve of Cash to be deposited into a
special reserve account on the Effective Date. The Class 5 Claims Reserve was not a trust,
nor was it required to be a trust.

[14] The Plan's language relative to the Professional Fee Escrow Account is an example of
Plan language that does require creation of a trust. Article II.B(2) states:

> On the Effective Date, the Reorganized Debtors shall establish and fund the
> Professional Fee Escrow Account with Cash equal to the Professional Fee
> Reserve Amount. The Professional Fee Escrow Account shall be maintained in
> trust solely for the Professionals. Such funds shall not be considered property
> of the Estates. The amount of Professional Fee Claims owing to the
> Professionals shall be paid in Cash to such Professionals by the Reorganized
> Debtors as soon as reasonably practicable after such Professional Fee Claims
> are Allowed. When all Allowed amounts owing to the Professionals have been
> paid in full, any amount remaining in the Professional Fee Escrow Account
> shall promptly be paid to the Reorganized Debtors without any further action
> or order of the Bankruptcy Court. If the Professional Fee Escrow Account is
> insufficient to fund the full Allowed amounts of Professional Fee Claims, the
> remaining unpaid Allowed Professional Fee Claims will be paid by the
> Reorganized Debtors.

The Plan's requirements as to the Professional Fee Escrow Account are clear: on the
Effective Date, Reorganized Debtors were required to create and fund an escrow account of
funds that were to be "maintained in trust solely for the Professionals." Consistent with the
creation of a trust, the Plan stated further: "Such funds shall not be considered property of
the Estates." These two provisions are consistent with the creation of a trust.  If the Plan's
intent was to create a trust for the benefit of the Professionals, then the funds could not be
part of the estates. *See Holmes Envtl., Inc. v. Suntrust Banks, Inc. (In re Holmes Envtl.,
Inc.)*, 287 B.R. 363, 374 (Bankr. E.D. Va. 2002) ("when a debtor does not own an equitable
interest in property he holds in trust for another, that interest is not property of the estate
for purposes of the Bankruptcy Code.") (citation omitted).  Nothing in the Plan or
Confirmation Order required holding the GUC Distribution in an escrow account. Nothing
in the Plan or Confirmation Order distinguished the GUC Distribution from other property
of the estates. Nothing in Article VII.D specified when any purported "trust" would be
created, in direct contract to the Plan's requirements for the Professional Fee Escrow

Complaint, which states that "Article VII.D of the Plan and Confirmation Order created a valid and enforceable trust in favor of the holders of Class 5 Claims," is simply wrong as it pertains to holders of undisputed claims such as DBTCA. Nothing in the Plan or the Confirmation Order created or required the creation of any trust for the GUC Distribution other than to preserve the disputed claimholders' portion of disbursed funds. The requirement was simply to create a "segregated account" to administer the GUC Distribution. Creation of a segregated account, by itself, does not establish a trust. Thus, the express language of the Plan and Confirmation Order, i.e., the intrinsic evidence, does not establish the intent to create a trust for the benefit of DBTCA.

As for extrinsic evidence, i.e., evidence involving the circumstances surrounding the creation of the language in the Plan and Confirmation Order, there is nothing in the Complaint beyond the assertion that the language at issue speaks for itself. The Complaint is void of any factual allegations that would support a finding that the parties intended to create a trust.[15] If anything, the circumstances would suggest otherwise.

The circumstances resulting in the creation of the provisions in question involved the confirmation of a chapter 11 plan. "The Bankruptcy Code permits and

---

Account. As shown, the Plan language sometimes required creation of a trust, but there was no such requirement for the GUC Distribution.

[15] According to the Restatement of Trusts, "[a]cts or communications prior to and subsequent to, as well as those contemporaneous with, the transfer or other act that is claimed to create a trust may be relevant in determining whether a property owner had the requisite intention to create a trust." Restatement (Third) of Trusts § 13 cmt. b (2003). The Complaint does not allege facts independent of the existence of the language at issue that the parties intended to create a trust.

encourages holders of claims to reach a negotiated settlement of their respective positions under a plan of reorganization and allows the court to confirm a negotiated plan." *Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 216 B.R. 175, 179 (E.D. Va. 1997), *aff'd*, 163 F.3d 598 (4th Cir. 1998). The Plan was largely consensual, and the negotiations that took place involved sophisticated stakeholders, including DBTCA. The Plan is a contract between the Reorganized Debtors and its creditors, to which general rules of contract interpretation apply.[16] *In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 261 (Bankr..E.D. Va. 2016). Neither the Plan nor the Confirmation Order required that the GUC Distribution be held in trust. When the Complaint's factual allegations are separated from its legal conclusions, the result is that the Complaint fails to state a claim upon which relief can be granted. At best, the allegations of the Complaint establish an unsecured claim against the Debtors but not a claim for breach of trust.[17]

---

[16] "The provisions of the confirmed plan resulting from that process bind the debtor and all its creditors." *Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 216 B.R. 175, 179 (E.D. Va. 1997), *aff'd*, 163 F.3d 598 (4th Cir. 1998).

[17] The Plaintiff, in its November 7, 2019, filing, requested that it be granted leave to amend the Complaint should any part of the Motion to Dismiss be granted, arguing that it has "developed additional evidence" and "Defendants would not be prejudiced by allowing DBTCA to amend its complaint to break out the breach of contract and tortious interference claims." (Doc 18, pp. 35-36). The Court notes that pursuant to its Pre-trial Order (Doc 25), trial in this matter was scheduled to commence on May 18, 2020, and discovery "may commence immediately and shall be completed on or before 21 days prior to the Trial Date." DBTCA's final submission in opposition to the Cross Motion was May 18, when the trial was scheduled to commence and three weeks after discovery was completed. Thus, DBTCA has had ample opportunity to submit any evidence that would have been available for trial.

As argued by the Plaintiffs in their November 7, 2019, memorandum, under Civil Procedure Rule 15(a)(2), courts may deny leave to amend a pleading when the amendment would be prejudicial to the opposing party or the amendment would be futile. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). Both circumstances exist in this case.

*Count One (Breach of Trust)*

Neither the Plan nor the Confirmation Order created a trust, and the

Reorganized Debtors did not create a trust.  The Reorganized Debtors established a

separate account to hold the GUC Distribution, which is what the Plan and

Confirmation Order required. (Complaint ¶¶ 2, 34. 35).  Because there was no trust,

the Plaintiff has failed to state a claim upon which relief can be granted for "breach

of trust."  Instead, DBTCA's remedy lies exclusively in the claims reconciliation

process, which DBTCA apparently recognized in its request for relief, which sought:

"an allowed claim in an amount to be determined by the Court …." (Complaint ¶

60).

*Count Two (Conversion)*

The Supreme Court of Delaware has held that conversion is an "act of

dominion wrongfully exerted over the property of another, in denial of his right, or

inconsistent with it." *Arnold v. Soc. for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del.

1996).  The tort of conversion generally requires that the plaintiff have an

ownership interest in or right to possession of property coupled with the defendant's

wrongful exercise of dominion or control over the property.  *See, e.g., Los Angeles*

*Fed. Credit Union v. Madatyan*, 209 Cal. App. 4th 1383, 1387 (Cal. Ct. App. 2012).

No trust was created or required to be created, and DBTCA had no ownership

---

The trial of this case was scheduled to take place before the confirmation hearing on
the Debtors' Chapter 11 Plan, which is scheduled for May 27, 2020.  The issues present in
this adversary proceeding will have a significant impact on confirmation.  Any further delay
in resolving this adversary proceeding would be significantly prejudicial to the Debtors.

interest in the GUC Distribution;[18] it held only a contractual claim against the Reorganized Debtors.  Again, DBTCA fails to state a claim upon which relief can be granted and is limited to asserting an unsecured claim through the claims reconciliation process.

### Count Three (Aiding and Abetting Breach of Trust)

Where there is no breach of trust, there can be no claim for "aiding and abetting breach of trust."  Under the facts alleged in the Complaint, there is no basis for holding Messrs. Inouye, Coulombe or Foster personally liable.  Therefore, Count Three fails to state a claim upon which relief can be granted.

### Count Four (Aiding and Abetting Conversion)

The Court having found that DBCTA had no ownership interest in the GUC Distribution and that the Defendants therefore did not convert DBCTA's property, there can be no resulting liability for aiding and abetting conversion.  Aside from the Plaintiff's conclusory allegations that Messrs. Inouye, Foster and Coulombe had "knowledge" that the transfer of the Funds "constituted conversion," there are no facts alleged to support the Plaintiff's claim that these individuals committed a

---

[18] DBTCA claims that it was granted "a continuing lien on further distributions to be made with respect to the 2018 Notes from the Trust Account." (Complaint ¶ 32).  However, the Confirmation Order only permitted DBTCA to assert any claim it might have against whatever distribution it may have received for the benefit of the bondholders.  *See* Confirmation Order, ¶ 101 (allowing DBTCA to "assert any right or lien it may have under the Unsecured Notes Indenture against such distributions and to deduct such unpaid fees and expenses from such distributions …").

tortious act. Since the Court has found that the Funds in the Reserve Account were
not being held in trust, this Count fails to state a viable cause of action.[19]

### Count Five (Turnover Under § 542(b))

Section 542(b) of the Bankruptcy Code provides that "an entity that owes a
debt that is property of the estate . . . shall pay such debt to . . . the trustee." 11
U.S.C. § 542(b). The Complaint does not allege a debt owed to the bankruptcy
estate but rather that the Funds at issue were "applied to repay other creditors"
before the second bankruptcy filing. (Complaint ¶¶ 50-52). There being no
allegation that a debt is owed to the estate, Count Five fails to state a claim upon
which relief can be granted.

### Count Six (Civil Contempt)

Defendants are seeking summary judgment as to all counts of the Complaint,
including Count Six. The Court will address the Motion to Dismiss Count Six in its
consideration of the Summary Judgment Motion and the Cross Motion.

## THE SUMMARY JUDGMENT MOTIONS

On April 20, 2020, DBTCA filed the Summary Judgment Motion. In its
accompanying memorandum, DBTCA argues that there are no undisputed facts
concerning the terms of the Plan and Confirmation Order and the treatment of the
Funds. Defendants filed their opposition on May 4, including the Cross Motion as
to Count Six.

---

[19] Neither the Plan nor the Confirmation Order established a lien on the Reserve Account in
favor of DBTCA. *See* note 18 *supra*.

<u>Standard of Review</u>.  Rule 56 of the Federal Rules of Civil Procedure[20]

provides that summary judgment is appropriate where there is no

genuine dispute as to any material fact and the moving party is entitled

to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247 (1986).  "Facts are 'material' when they might

affect the outcome of the case, and a 'genuine issue' exists when the

evidence would allow a reasonable jury to return a verdict for the

nonmoving party."  *The News & Observer Publ'g Co. v. Raleigh-Durham*

*Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  In their submissions to

the Court, each side argues that the material facts are not in dispute.[21]

<u>Factual Findings</u>.  On May 19, 2020, the parties submitted a Joint Statement

of Undisputed Facts (the "Stipulations") (ECF 46).  The Stipulations are as follows:

1. On June 11, 2017, The Gymboree Corporation and seven (7) of its
   affiliated debtors (the "Prior Debtors") each filed a voluntary petition
   for relief under Chapter 11 of the United States Bankruptcy Code in

---

[20] Fed. R. Civ. P. 56, made applicable herein by Bankruptcy Rule 7056, Fed. R. Bankr. P
7056.

[21] "The material facts are not in dispute."  Deutsche Bank Trust Company Americas'
Memorandum of Law in Support of Motion for Partial Summary Judgment for Civil
Contempt, ECF 35, p. 5.  "The record, as DBTCA represents in its motion for summary
judgment, and as shown by Defendants' opposition, is fully and completely sufficient for the
Court to rule on Defendants' authorities showing how Plaintiff's claims fail as a matter of
law."  Defendants' Renewal of its Motion to Dismiss Under Rule 12(b)(6) and Cross-Motion
for Summary Judgment, ECF 40, ¶ 12, p. 4.  "At this stage in the litigation, it is now clear,
based on the record and representations in the DBTCA Motion and Defendants' opposition
thereto, that there is no material fact in dispute and nothing preventing the Court from
ruling on DBTCA's claims as a matter of law.  *Id.*, ¶ 22, p. 6.

the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division). Those cases were jointly administered under Case No. 17- 32986 (the "2017 Bankruptcy Case").

2. On August 30, 2017, the Prior Debtors filed the Amended Joint Chapter 11 Plan of Reorganization of The Gymboree Corporation and its Debtor Affiliates (the "2017 Plan"). [Case No. 17-32986, Docket No. 583].

3. On September 7, 2017, the Court entered its Order Confirming the Joint Chapter 11 Plan of Reorganization of the Gymboree Corporation and Its Debtor Affiliates (the "2017 Confirmation Order"). [Case No. 17-32986, Docket No. 646].

4. Attached as Exhibit A to the 2017 Confirmation Order was a copy of the 2017 Plan.

5. The Effective Date of the 2017 Plan was September 29, 2017. [Case No. 17-32986, Docket No. 676].

6. On or about September 29, 2017, Mr. Inouye deposited the GUC Distribution, in the amount of $4,500,000.00, into the Bank of America / Merrill Lynch account ending in 6DWJ, in accordance with the 2017 Plan and the 2017 Confirmation Order.

7. On or about September 29, 2017, Mr. Inouye purchased investments held in the FIMM Portfolio within Bank of America/Merrill Lynch account ending in 6DWJ using the GUC Distribution.

8. On May 3, 2018, the Reorganized Debtors removed $2,532,283.94 from the FIMM Portfolio in order to make an initial distribution (the "Initial Distribution") to holders of allowed Class 5 Claims under the 2017 Plan.

9. DBTCA, as the former indenture trustee, received $2,510,193.91 of the Initial Distribution for the benefit of itself and the holders of the 2018 Notes.

10. As of May 31, 2018, the FIMM Portfolio had a value of $2,000,375.79.

11. On October 1, 2018, Gymboree Group, Inc. engaged Berkeley Research Group ("BRG") to provide services described in an engagement letter dated October 16, 2018.

12. On December 17, 2018, the Board of Directors of Gymboree Holding Corporation appointed Mr. Coulombe to serve as chief restructuring officer ("CRO") of Gymboree Group, Inc.

13. The CRO's responsibilities were specified in an engagement letter dated December 15, 2018.

14. During the time that Mr. Foster was providing services to Gymboree Group, Inc., he reported to the CRO and worked under the CRO's supervision.

15. On or about January 2, 2019, Mr. Foster, in his role as Director of BRG, was assigned to assist Gymboree Group, Inc. in its cash management function, among other responsibilities.

16. On January 9, 2019, Mr. Foster directed Mr. Inouye to transfer the remainder of the GUC Distribution held in the FIMM Portfolio from the account ending in 6DWJ into a Bank of America account ending in 1406 (the "Concentration Account").

17. Mr. Foster directed the transfer of the remainder of the GUC Distribution held in the FIMM Portfolio to the Concentration Account with the CRO's knowledge and consent.

18. On January 9, Mary Doheny, one of the Debtors' attorneys at Milbank, emailed Michael Bohne at BRG to say that "from what we were able to determine this [the balance of $1,967,716.05 mentioned in the preceding email from Ms. Leontyev at the debtor] is unrestricted cash, and we told the company that in December."

19. Mr. Bohne forwarded this email to Defendant Michael Foster the same day.

20. In response, Mr. Foster emailed Defendant David Inouye several minutes later, to say that "the funds in this account should also be transferred to the BofA concentration account...[.]"

21. Mr. Inouye replied to say that the cash was restricted for pending payments from the prior bankruptcy, and asked if it could be transferred.

22. Mr. Foster responded, "I confirmed that we're OK pulling those funds in." Mr. Inouye then replied "Will do."

23. A true and correct copy of this e-mail exchange is annexed as Exhibit G to the Parry Declaration and is also annexed as Exhibit A hereto.

24. On January 9, 2019, Mr. Inouye effected a transfer of money in the approximate amount of $2,027,304.08 from the Bank of America / Merrill Lynch account ending in 6DWJ to the Concentration Account consistent with counsel's statement that the funds were unrestricted cash.

25. The January 9, 2019 transfer of money from the FIMM Portfolio account to the Concentration Account was made after counsel communicated that the funds were unrestricted cash.

26. Following the January 9, 2019 transfer, the Bank of America / Merrill Lynch account ending in 6DWJ had a balance of $0.00.

27. On January 9, 2019, the Concentration Account had a closing ledger balance of $3,146,826.75.

28. On January 10, 2019, the Concentration Account had a closing ledger balance of $3,611,470.71.

29. On January 11, 2019, the last transfer out of the Concentration Account was an outgoing wire transfer of $5,849,678.26 to Bank of America account number CT2-547-05-23-99.

30. On January 11, 2019, the Concentration Account had a closing ledger balance of $70,517.67.

31. On January 14, 2019, the Concentration Account had a closing ledger balance of $220,467.45.

32. On January 15, 2019, the Concentration Account had a closing ledger balance of $304,042.04.

33. On January 16, 2019, the Concentration Account had a closing ledger balance of $245,830.19.

34. On January 16, 2019, Gymboree Group, Inc. and ten (10) affiliated debtors each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division). Those cases are being administered jointly under Case No. 19-30258.

The Court's findings of fact incorporate the Stipulations.  The Court also
finds that the January 9, 2019, transfer of money from the FIMM Portfolio Account
[an investment account at Merrill Lynch holding the remainder of the GUC
Distribution, also referred to herein as the Reserve Account] was made on advice of
counsel.[22]  There are no other material facts in the parties' submissions that would
affect the outcome of this case.[23]

The Stipulations, devoid of the legal conclusions intermixed with the factual
allegations in the Complaint and legal memoranda, bear out what the pleadings
already reveal.  The parties generally agree on the relevant facts but strongly
disagree over the dispositive issue in this case—whether the language contained in
the Plan and Confirmation Order, primarily Article VII.D of the Plan, establishes a
trust.[24]  As already discussed *supra*, the Court has determined that it did not.

---

[22] Doc 39, Exhibit 3, E-mail chain dated Jan. 9, 2019; Exhibit 2, July 24, 2019, hearing
transcript, at 66:3-66:12; Exhibit 5, E-mails from debtors' bankruptcy counsel dated
February 28, 2019; see also, Emergency Motion for Interim and Final Orders (I) Enforcing
the Automatic Stay, (II) Directing Parties to Comply with the Prior Plan, and (III) Granting
Related Relief, at 13 n. 8 (ECF 878); Objection of Deutsche Bank Trust Company Americas
to: (A) Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement [etc.],
¶¶ 21, 29, 30 (ECF 1389); DBTCA's Proposed Disclosure Statement Insert (ECF 14120.
[23] "A fact is material if it might affect the outcome of the suit under the governing law."
*Jones v. Chandrasuwan,* 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va.
v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).
[24] Plaintiff: "The Plan and the Confirmation Order unequivocally establish that a trust
relationship existed" (ECF 45, p.5).  Defendants: "The fact that DBTCA did not receive a
final payment from the GUC Distribution is not in dispute, and the terms of the Plan are
certainly not in dispute.  Accordingly, the construction of contractual language is simply a
question of law for the Court." (ECF 39, pp. 2-3); "Nothing in this Plan language (or any
other language found in the Plan and Confirmation Order) created any trust . . . ."  (ECF
10, p. 9).

<u>Conclusions of Law</u>.  In Count Six of the Complaint, DBTCA seeks to hold all the Defendants in civil contempt for willfully violating the Confirmation Order by their transfer of the Funds from the Reserve Account to the Concentration Account on January 9, 2019.  DBTCA contends that "[t]he Confirmation Order did not condition the obligation to distribute the Reserve to holders of allowed Class 5 Claims on a determination that the Reserve was a trust fund."  (ECF 42, p.2). DBTCA thus is asking for judgment against each of the Defendants for civil contempt of the Confirmation Order despite this Court's finding that the Funds transferred were not being held in trust for its benefit and without regard to the fact that the Reorganized Debtors' decision not to fulfill their payment obligations in connection with the Confirmation Order was made on the advice of counsel and took place on the eve of an imminent bankruptcy filing.  Neither the facts nor the law supports DBTCA's position.

In *Taggert v. Lorenzen*, 139 S.Ct.1795 (2019), the Supreme Court clarified the standard that would permit a finding of civil contempt.  The Court held that "[a] court may hold a creditor in civil contempt for violating a discharge order where there is not a 'fair ground of doubt' as to whether the creditor's conduct might be lawful under the discharge order."  *Id*. at 1804.  In doing so, the Court specifically rejected the "strict-liability" standard being urged by the Plaintiff.  *Id*. at 1803. Under *Taggert,* if there is a "fair ground of doubt" as to whether Defendants' conduct was a violation of the Confirmation Order, then a finding of contempt is not permitted. *Id*. at 1804.

In this case, the evidence does not support a finding of civil contempt. The Defendants were dealing with circumstances not contemplated in either the Confirmation Order or Plan—a second bankruptcy. The Reorganized Debtors' obligations in connection with the GUC Distribution were unclear, at best.[25] The evidence establishes that there was a fair ground of doubt about whether the Reorganized Debtors had an absolute duty to pay the remaining Funds in the GUC Distribution to Class 5 claimants. Accordingly, the Court finds that DBTCA has not carried its burden of proving that the Defendants' conduct was objectively unlawful under the Confirmation Order by clear and convincing evidence. *See Ashcroft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000). DBTCA's Summary Judgment Motion will be denied and the Defendants' Cross Motion will be granted as to Count Six of the Complaint.[26]

*Counts One through Five*

---

[25] Even DBTCA acknowledges the discrepancy between the Plan's language governing the GUC Distribution and the more precise language governing the funds held in escrow for the benefit of the professionals: "Article VII.D was hurriedly drafted on the eve of the confirmation hearing as a last minute amendment to avert a Class 5 objection to confirmation, which rush may account for the way it was drafted." ECF 20, p. 18, n.12.

[26] In light of the Court's finding that DBTCA has failed to carry its burden of proof in connection with Count Six, it is not incumbent upon the Court to address the Defendants' contention that they are protected under the release and exculpation provisions contained in Article VIII.G of the Plan. Article VIII.G "released and exculpated" the Exculpated Parties from any claim related to an act or omission in connection with, relating to, or arising out of the Plan, including the distribution of property, with the exception of claims based on fraud, willful misconduct, or gross negligence. "Exculpated Parties" included the Reorganized Debtors, their current and former officers, employees and professionals. (Art. I.A(101)). Article VIII.G also provides that "in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan." The Court finds that the evidence falls short of that necessary to establish that the Defendants committed fraud, were grossly negligent or otherwise engaged in willful misconduct and, as an alternative ruling, holds that Count Six is barred under the Plan's release and exculpation provisions.

The Defendants contend that the record is sufficient to grant summary judgment in their favor as to Counts One through Five and have asked the Court to consider the Motion to Dismiss as a motion for summary judgment pursuant to Rule 56.  Defendants cite the Fourth Circuit's decision in *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442 (4th Cir. 2007), as authority for this Court to convert a motion to dismiss under Rule 12(b)(6) to a motion for summary judgment when the record has been sufficiently developed.  *Id*. at 451 ("Given the development of the record . . . we feel confident that we can apply the summary judgment standard in this case.").  The Court agrees with the Defendants that it is appropriate to apply the summary judgment standard in this adversary proceeding.  The record is sufficiently developed for purposes of converting the Motion to Dismiss to a motion for summary judgment.

Counts One through Five are each founded on the contention that language included in the Plan and Confirmation Order established a trust in favor of Class 5 creditors, a contention that the Court has rejected.  The record and undisputed facts establish that DBTCA has failed to carry its burden of proof as to Counts One through Five.  The Court will grant summary judgment in favor of the Defendants as to Counts One through Five.

## CONCLUSION

The Plan and Confirmation Order did not create a trust in favor of the Class 5 claimants, and no such trust was created.  It follows that Counts One through Five fail to state a claim upon which relief may be granted.  Having considered the

record, pleadings, and arguments of counsel, the Court finds no material facts in

dispute and finds that DBTCA has failed to submit any evidence whatsoever that

would support a finding that the alleged trust existed.  Therefore, summary

judgment should be entered in favor of the Defendants as to Counts One through

Five of the Complaint.  The Court will also grant the Defendants' Cross Motion as to

Count Six.

  A separate order shall be issued.

Signed: May 26, 2020

Entered on Docket May 26, 2020

          ___/s/ Keith L. Phillips___
          United States Bankruptcy Judge


Copies to:

Franklin R. Cragle, III
Hirschler Fleischer, PC
2100 East Cary Street
PO Box 500
Richmond, VA 23218-0500

Brittany Berlauk Falabella
Hirschler Fleischer, A Professional Corp
2100 East Cary Street
P.O. Box 500
Richmond, VA 23218-0500

Robert S. Westermann
Hirschler Fleischer, P.C.
2100 East Cary Street
The Edgeworth Building
Richmond, VA 23223

Brian H. Richardson
Kutak Rock LLP
901 East Byrd Street

Suite 1000
Richmond, VA 23219-4071

John B. Sieg
O'Hagan Meyer, PLLC
411 E. Franklin Street, Suite 500
Richmond, VA 23219

Mark N. Parry
MOSES & SINGER LLP
405 Lexington Avenue
New York, NY 10174

Alan Gamza
MOSES & SINGER LLP
405 Lexington Avenue
New York, NY 10174